Lawrence A. WARDEN, Robert Jackson, Raisa Castillo, Edwin Peters, Robert Lizardo, Louisa Chan, Venice Anglero, Martha Espinal, individually and pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs,

v.

George PATAKI, as Governor of the State of New York, Sheldon Silver, as Speaker of the Assembly of the State of New York, Joseph Bruno, as Speaker of the Senate of the State of New York, the Assembly of the State of New York, the Senate of the State of New York, Rudolph Giuliani, as Mayor of the City of New York, Edward F. Stancik, as Commissioner of Investigation for the City of New York, Rudolph Crew, as Chancellor of the New York City Public Schools, the New York City Board of

Education, William C. Thompson, Jr., Irene H. Impellizzeri, Jerry Camarata, Carol Gresser, Sandra E. Lerner, Luis O. Reyes, Ninfa Segarra, as members of the New York City Board of Education, Defendants.

Louisa M. Chan, individually and pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff,

v.

George Pataki, as Governor of the State of New York, Rudolph Giuliani, as Mayor of the City of New York, the New York City Board of Education, William Thompson, Jr., Irene H. Impellizzeri, Jerry Camarata, Carol Gresser, Sandra Lerner, Luis Reyes, Ninfa Segarra, as members of the New York City Board of Education, Rudolph Crew, as Chancellor of the New York City Public Schools, Defendants.

Nos. 97 CIV. 7027 (MBM), 98 CIV. 2879 (MBM).

United States District Court, S.D. New York.

Feb. 11, 1999.

Edward H. Wolf, Bronx, NY, for Warden Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York, Georgia Pestana, Assistant Corporation Counsel, New York City, for Warden Municipal Defendants.

Elliot L. Spitzer, Attorney General of the State of New York, Joel Graber, Assistant Attorney General, New York City, for State Defendants.

Louisa Chan, Corona, NY, pro se.

Michael D. Hess, Corporation Counsel of the City of New York, Kerri L. Jew, Assistant Corporation Counsel, New York City, for Chan Municipal Defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

These cases present broad attacks on the current system of governance for, and administration of, New York City's public schools. In 97 Civ. 7027, plaintiffs (the "*Warden* plaintiffs") bring a class action against various state officials (the "State Defendants") and municipal officials (the "Municipal Defendants"), alleging that the method of selecting members for the city Board of Education (the "city board"), recent amendments to N.Y. Educ. Law § 2590 and actions of defendant New York City Schools Chancellor Rudy Crew violate numerous statutes and constitutional provisions. In 98 Civ. 2879, plaintiff *pro se* Louisa M. Chan raises nearly identical claims against substantially the same defendants, also as a class action.

In an earlier opinion, familiarity with which is assumed, a three-judge panel granted summary judgment for the Municipal Defendants with respect to the *Warden* plaintiffs' claim that the method for selecting members of the city board violates the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq. See Warden v. Pataki,* 12 F.Supp.2d 325 (S.D.N.Y.1998) (three-judge panel).[1] The Municipal Defendants now move, pursuant to Fed.R.Civ.P. 56, for summary judgment in both cases, on all remaining claims. In addition, the State Defendants move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss both actions for failure to state a claim. Because Chan is a named plaintiff in both actions, and the two cases raise substantially the same issues, the parties have agreed that all papers submitted should be considered in reference to both cases wherever relevant.

1. In her memorandum in opposition to defendants' motions, Chan avers that her claims arise solely under the Constitution. (*See Chan* Pl. Mem. in Opp'n to Mun. Def. at 2–4) To the extent that her complaint could be construed to state a claim under the Voting Rights Act, it would be barred by the principles of *res judicata* and collateral estoppel. *See, e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 644–45 (2d Cir.1998).

For the reasons stated below, defendants' motions are granted in their entirety, and the complaints in both cases are dismissed.

## I.

The New York City public school system is unique within the State of New York. Established pursuant to Article 52–A of the New York Education Law, the system is divided into 32 community school districts, each of which is governed by a community school district board ("community board"). *See* N.Y. Educ. Law § 2590–b (McKinney 1995 & 1999 Supp.). Each community board is composed of nine members, elected for three-year terms. *See id.* § 2590–c. Overseeing all 32 community boards is the city board, which is composed of seven members, a member appointed by each of the five elected borough presidents and two members appointed by the mayor. *See id.* § 2590–b.1(a). Finally, the city board appoints a Chancellor, who serves for a term not to exceed by more than one year the term of the city board which appointed him. *See id.* § 2590–h. The respective duties and powers of the city board, the community boards and the Chancellor are set forth in detail in New York Education Law Article 52–A.

In these cases, plaintiffs challenge several aspects of the system established by New York Education Law Article 52–A. One category of claims, part of which was disposed of by the three-judge panel, relates to the composition of the city board. Insofar as plaintiffs challenge the statute on its face, their remaining claims all relate to amendments passed by the state legislature and signed by defendant Governor George Pataki in 1996. *See* 1996 N.Y. Laws ch. 720. The 1996 amendments, which became effective in 1997, altered the relationship between the city board, the community boards and the Chancellor, for the most part by enhancing the powers of the city board and Chancellor at the expense of the community boards. (*E.g., Chan* Compl. Ex. 1) To the extent relevant to plaintiffs' claims, the 1996 amendments limited the role of community board members over the hiring and firing of school personnel; created a mandatory training re-

quirement for all new community board members; and enhanced the Chancellor's powers to suspend or remove community board members for misfeasance or nonfeasance.[2]

As noted, plaintiffs challenge also certain actions of defendant Chancellor Crew. In 1996 and 1997, acting pursuant to his powers to suspend or remove community board members, the Chancellor suspended and/or removed some or all of community boards 5, 7, 9, and 12, in each case citing some combination of misconduct, institutional paralysis or academic failure traceable to the community school district. (Mun. Def. Rule 56.1 Statement ¶¶ 6–38) All four community boards were composed primarily of racial or ethnic minorities. (*Warden* Compl. ¶ 59) In each case, the Chancellor's actions were ultimately approved by the United States Department of Justice pursuant to section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. (Mun. Def. Rule 56.1 Statement ¶¶ 11, 13, 18, 31, 38) Of the four community boards at issue, at least two remained in the control of racial or ethnic minorities after the Chancellor's interventions. (*Id.* ¶¶ 17, 29)

## II.

■ To begin, the State Defendants' motion to dismiss both cases pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim must be granted. The principal basis for plaintiffs' claims against the State Defendants is the State Defendants' role in enacting the legislation at issue. (*See Warden* Compl. ¶ 26; *Chan* Compl. ¶ 37) The well-settled doctrine of absolute legislative immunity, however, bars actions against legislators or governors—and, *a fortiori*, legislatures—on the basis of their roles in enacting or signing legislation. *See Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731–34, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Tenney v. Brandhove*, 341 U.S. 367, 376–79, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *see also Lajoie v. Connecticut State Bd. of Labor Relations*, 837 F.Supp. 34, 40 (D.Conn.1993) (Cabranes, C.J.). The cases cited by the *Warden* plain-

---

**2.** The specifics of each statutory revision are detailed further below.

tiffs in their complaint—*Spallone v. United States,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), and *Bush v. Orleans Parish School Board,* 138 F.Supp. 337 (E.D.La.1956), *aff'd,* 242 F.2d 156 (5th Cir. 1957), (*see Warden* Compl. ¶ 65)—do not hold otherwise: *Bush* involved a suit against state agencies, not legislators, and in *Spallone,* the Supreme Court reversed a contempt order entered against members of a municipal council without even having to reach the question of immunity. *See Spallone,* 493 U.S. at 266, 110 S.Ct. 625; *see also id.* at 633 (citing, and thereby reaffirming, *Tenney* and *Supreme Court of Virginia* ).

■ The *Warden* plaintiffs base their claims against Governor Pataki on an additional basis: namely, on the Governor's duty under the New York Constitution to "take care that the laws are faithfully executed." N.Y. Const. art. 4, § 3. Although there is some authority to support plaintiffs' position, *see, e.g., Ass'n of Am. Med. Colleges v. Carey,* 482 F.Supp. 1358, 1363 ·(N.D.N.Y.1980), the vast majority of courts to consider the issue have held—correctly, in my view—that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute. *See, e.g., 1st Westco Corp. v. School Dist.,* 6 F.3d 108, 113 (3d Cir.1993) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law.") (citing *Rode v. Dellarciprete,* 845 F.2d 1195, 1208 (3d Cir.1988)); *Shell Oil Co. v. Noel,* 608 F.2d 208, 211 (1st Cir.1979) ("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute."); *see also Gras v. Stevens,* 415 F.Supp. 1148, 1151–52 (S.D.N.Y.1976); *cf. Mendez v. Heller,* 530 F.2d 457, 460 (2d Cir.1976) (holding that the state attorney general's duty to support the constitutionality of challenged state statutes and his duty to defend actions in which the state is interested do not constitute enforcement of the statute in question). Accordingly, plaintiffs' claims with respect to the State Defendants are dismissed.

III.

As noted, the Municipal Defendants move for summary judgment in both cases. Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). Nevertheless, Rule 56 jurisprudence is clear in "provid[ing] that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, therefore, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990).

Read liberally, plaintiffs' complaints raise claims under the First Amendment, the Sixth Amendment, the Fourteenth Amendment, the Fifteenth Amendment, the Nineteenth Amendment, the Voting Rights Act and 42 U.S.C. § 1985(3), which creates a cause of action with respect to conspiracies to violate one's civil rights. The Municipal Defendants raise different arguments with respect to each category of plaintiffs' claims. Therefore, I will deal with each category individually.

A. *Voting–Related Claims*

■ Several of plaintiffs' claims challenge the constitutionality of N.Y. Educ. Law § 2590 as it pertains to voting. First, invoking the Equal Protection Clause and noting that the city board's composition is similar to

that held unconstitutional in *Oliver v. Board of Education,* 306 F.Supp. 1286 (S.D.N.Y. 1969), *discussed in Warden,* 12 F.Supp.2d at 326–27, plaintiffs contend that the composition of the city board offends the constitutional principle of "one person, one vote" recognized in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). (*See Warden* Compl. ¶¶ 48–51; *Chan* Compl. ¶ 3) The "one person, one vote" principle, however, has no applicability when the governmental body at issue is appointive rather than elective. *See Sailors v. Board of Educ.,* 387 U.S. 105, 111, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) ("Since the choice of members of the county school board did not involve an election . . ., the principle of 'one man, one vote' has no relevancy."); *see also Hadley v. Junior College Dist.,* 397 U.S. 50, 54–58, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) ("[W]here a State chooses to select members of an official body by appointment rather than election, and that choice does not itself offend the Constitution, the fact that each official does not 'represent' the same number of people does not deny those people equal protection of the laws." (citing *Sailors* )). Moreover, contrary to plaintiffs' contentions (*see Warden* Compl. ¶ 51), this is the case whether or not the body is appointed by officials who are themselves elected, *see Sailors,* 387 U.S. at 109–10, 87 S.Ct. 1549; *Oliver,* 306 F.Supp. at 1289, and whether or not the elected officials could theoretically appoint themselves to fill the positions at issue. *See, e.g., Rosenthal v. Board of Educ.,* 385 F.Supp. 223, 224–26 (E.D.N.Y.1974) (three-judge panel), *aff'd,* 420 U.S. 985, 95 S.Ct. 1418, 43 L.Ed.2d 667 (1975); *cf. Board of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) (holding that the statute that established New York City's Board of Estimate violated the Equal Protection Clause—even though the Board's officials were not directly elected—because borough presidents, when elected, became members of the Board *ex officio* ). In short, notwithstanding the similarities between the current composition of the city board and the structure of the election-based system held unconstitutional in *Oliver,* plaintiffs' equal protection challenge must be rejected. *Cf. Oliver,* 306 F.Supp. at 1289 (explicitly upholding an interim appointed Board of Education on the ground that it was not elected, notwithstanding the fact that its composition was essentially identical to the system struck down).

■ The fact that the city board is appointed rather than elected is fatal also to plaintiffs' other voting-related claims, raised under the Fifteenth and Nineteenth Amendments. (*See Warden* Pl. Mem. in Opp'n to Mun. Def. at 19–24; *Chan* Pl. Mem. in Opp'n to Mun. Def. at 2–4) Those Amendments prohibit a state from denying or abridging the right to vote on the grounds, *inter alia,* of race or sex. *See Gray v. Sanders,* 372 U.S. 368, 379, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). They do not create a generalized right to vote, as such, but merely "guarantee to every citizen the right to participate in the electoral process *once a State has chosen to select its public officials by popular vote.*" *Bachur v. Democratic Nat'l Party,* 666 F.Supp. 763, 781 (D.Md.) (emphasis added), *rev'd on other grounds,* 836 F.2d 837 (4th Cir.1987). Where, as here, *all* citizens are denied the vote, without regard for race or sex, the Fifteenth and Nineteenth Amendments are plainly irrelevant.

### B. *Other Equal Protection Claims*

Beyond their voting-related claims, plaintiffs raise three additional categories of claims under the Equal Protection Clause. The first set arises from alleged disparate treatment between New York City's community boards and school boards elsewhere in New York State, particularly in Union Free School Districts. Plaintiffs complain, for example, that N.Y. Educ. Law § 2590 places greater restrictions on New York City community board members with respect to hiring, supervising, and firing school employees; that school board members elsewhere in the state are not required to undergo mandatory training, as is required by N.Y. Educ. Law § 2590–e.7; and that school board members elsewhere benefit from stronger protections in the disciplinary process. (*See, e.g., Warden* Compl. ¶¶ 15, 74, 95)

To prevail on this type of equal protection claim, plaintiffs would have had to show that they were treated differently in comparison with other parties similarly situated and that there was no rational basis for that disparate treatment. *See, e.g., Sag Harbor Port Assoc. v. Village of Sag Harbor,* 21 F.Supp.2d 179, 185 (E.D.N.Y.1998) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). This plaintiffs have failed to do.

First, contrary to plaintiffs' assertions, New York City's education system and those of other jurisdictions within the state are not similarly situated: New York City's system is substantially larger and its governance structure is unique. *Compare* N.Y. Educ. Law § 1701 *et seq.* (specifying the powers and duties of educational bodies in Union Free School Districts), *with id.* § 2590 *et seq.* (specifying the same for New York City). Indeed, New York City is the only jurisdiction within the state that even has community boards. *Compare id.,* art. 52–A, *with id.,* art. 52. Given such differences, the Equal Protection Clause does not mandate identical treatment of the sort sought by plaintiffs. *Cf. Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997) ("[T]he constitutional guarantee of equal protection does not forbid all classifications, but rather 'keeps governmental decisionmakers from treating differently persons who are *in all relevant respects alike.'*") (emphasis added) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)), *cert. denied,* —— U.S. ——, 118 S.Ct. 1812, 140 L.Ed.2d 950 (1998).

Second, even assuming that the differences between New York City's school system and those in other jurisdictions were immaterial, plaintiffs have failed to produce any evidence to show that the legislature's disparate treatment lacked a rational basis. The state legislature is presumed to act constitutionally, and it is a plaintiff's burden to prove otherwise. *See Butts v. City of New York,* 779 F.2d 141, 147 (2d Cir.1985); *cf. New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (holding that a plaintiff must show that a statute " 'could never be applied in a valid manner' " to prevail in a facial attack on its validity) (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Accordingly, this category of equal protection claims must be dismissed.

Plaintiffs' next set of equal protection claims focuses on the alleged effects of N.Y. Educ. Law § 2590 on community boards within New York City. Specifically, plaintiffs complain that the statute discriminates against minorities because it limits the ability of community boards to hire school officials and to be represented by counsel of choice. (*See Warden* Compl. ¶¶ 44, 49) However, plaintiffs' conclusory assertions to the contrary notwithstanding, there is no evidence to support a finding that N.Y. Educ. Law § 2590 disparately affects minorities, much less that its drafters were motivated by discriminatory purpose—the *sine qua non* of an equal protection claim. *See Lewis v. Casey,* 518 U.S. 343, 374, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[A]bsent proof of discriminatory purpose, a law or official act does not violate the Constitution 'solely because it has a ... disproportionate impact.' ") (quoting *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). Moreover, to the extent that N.Y. Educ. Law § 2590 does actually limit the powers of community boards, it does so with respect to all community boards in New York City, regardless of racial or ethnic composition. Insofar as plaintiffs bring a facial challenge to the statute under the Equal Protection Clause, therefore, their claims must be dismissed.

Plaintiffs' remaining equal protection claims do not pose a facial attack on N.Y. Educ. Law § 2590, but rather challenge particular actions of defendant Chancellor Crew. Specifically, plaintiffs charge that the Chancellor singled out community boards 5, 7, 9 and 12 for adverse treatment because they were controlled or dominated by minorities. (*See Warden* Compl. ¶ 59) Community boards 5, 7, 9 and 12 were, indeed, controlled or dominated by minorities, but to establish a violation of the Equal Protection Clause requires more, namely, proof of discriminatory purpose. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ("To prove an equal

protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." (citations omitted)). Discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

■■■ In these cases, plaintiffs have failed to submit any competent evidence to establish that the Chancellor acted with discriminatory purpose in suspending and/or removing members of community boards 5, 7, 9 and 12. In light of the fact that the Municipal Defendants have furnished evidence that the Chancellor's actions were taken for legitimate, nondiscriminatory reasons—namely, in response to malfeasance and nonfeasance on the part of community board members—this failure warrants summary judgment against plaintiffs.[3] *See, e.g., Shelden v. Barre Belt Granite Employer Union Pension Fund*, 25 F.3d 74, 79 (2d Cir.1994) ("In opposition to a properly supported motion for summary judgment, the opposing party must come forward with materials such as affidavits, documents, interrogatory answers, or other competent evidence to show that there is a genuine issue of material fact for trial."). Accordingly, plaintiffs' equal protection claims are all dismissed.[4]

**C. Due Process Claims**

■■■ Next, plaintiffs raise two claims under the Due Process Clause of the Fourteenth Amendment. First, plaintiffs contend that with the amendment of N.Y. Educ. Law § 2590, powers formerly vested in community boards have been unlawfully transferred to the city board. As a result of this concentration of power, plaintiffs complain, community board members and parents have been "deprived of the power to fashion their separate destinies." (*Warden* Compl. ¶ 49; *see Chan* Compl. ¶ 4) In order to prevail on a deprivation of due process claim, however, a plaintiff must prove that "state action deprived him of a protected property or liberty interest." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1061–62 (2d Cir. 1993). Property interests are " 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Id.* at 1062 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

Here, plaintiffs have not shown—nor could they show—the requisite deprivation of a liberty or property interest. Indeed, in New York, public officials, whether elected or appointed, have "no contractual, vested or property right" in the office they hold. *Lanza v. Wagner*, 11 N.Y.2d 317, 324, 229 N.Y.S.2d 380, 385, 183 N.E.2d 670 (1962), *appeal dismissed*, 371 U.S. 74, 83 S.Ct. 177, 9 L.Ed.2d 163 (1962). Rather, "[p]ublic offices are cre-

---

3. It is not insignificant, as well, that community boards 7 and 9, at least, continued to be controlled by minorities, even after the Chancellor's interventions. (*See* Mun. Def. Rule 56.1 Statement ¶¶ 17, 29)

4. Plaintiff Chan raises one additional equal protection claim, alleging that the city board violated the rights of students enrolled in English as a Second Language programs by "not allowing them to take the annual city-wide tests in 1997 and 1998." (*Chan* Mem. in Opp'n to Mun. Def. at 6; *see Chan* Compl. ¶ 35) The merits of this claim aside, Chan does not have standing to raise it on behalf of the students who allegedly suffered harm. *See Powers v. Ohio*, 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (explaining the required elements of third-party standing); *see also* Fed.R.Civ.P. 23(a)(3) (mandating as a prerequisite to a class action that "the claims or defenses of the representative

parties are typical of the claims or defenses of the class").

In her memorandum in opposition to the Municipal Defendants' motion, plaintiff Chan asserts also several violations of the Privileges or Immunities Clause of the Fourteenth Amendment. (*See Chan* Pl. Mem. in Opp'n to Mun. Def. at 2) The Privileges or Immunities Clause, however, "has no application to a citizen of the State whose laws are complained of." *Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 138, 21 L.Ed. 442 (1872); *see United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 217, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (citing *The Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 72, 21 L.Ed. 394 (1872)); *see also Schulz v. New York State Exec.*, 960 F.Supp. 568, 576–78 (N.D.N.Y.1997), *aff'd*, 162 F.3d 1148 (2d Cir.) (table), *cert. denied*, — U.S. —, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998).

ated for the benefit of the public" and, "[a]bsent any express constitutional limitation, the Legislature has full and unquestionable power to abolish an office of its creation or to modify its term." *Id.*, 229 N.Y.S.2d at 385, 183 N.E.2d 670. *A fortiori*, therefore, plaintiffs do not have a legally protected interest in a particular distribution of power between the community boards and the city board, and plaintiffs' first due process claim must be dismissed.

Plaintiffs' second due process claim—that the Due Process Clause mandates a full evidentiary hearing before a community board member can be suspended—is without merit also. Consideration of what procedural due process requires depends on the balancing of "three distinct factors": (1) the government's interest in the matter that will be affected by official action; (2) the private interest involved; and (3) " 'the probable value, if any, of additional or substitute procedural safeguards.' " *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 1812, 138 L.Ed.2d 120 (1997) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Here, the government's interests—in the quality of public education and the prevention of public school corruption—are strong. Indeed, the Supreme Court has called education " 'perhaps the most important function of state and local governments.' " *Honig v. Doe*, 484 U.S. 305, 309, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (quoting *Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954)); *see also Lavelle v. Quinones*, 679 F.Supp. 253, 259 (E.D.N.Y.1988) ("[M]aintenance of public confidence in the integrity of the ad-

ministration of the schools is of concern to the entire city."). In contrast, the personal interest of community board members is weak. Indeed, as noted, community board members have no vested rights in their offices at all. *See, e.g., Ramos v. Cortines*, 216 A.D.2d 199, 199, 628 N.Y.S.2d 662, 662 (1st Dep't 1995) (citing *Matter of Roher v. Dinkins*, 32 N.Y.2d 180, 188, 344 N.Y.S.2d 841, 846, 298 N.E.2d 37 (1973), and *Matter of Ocean Hill–Brownsville Governing Bd. v. Board of Educ.*, 23 N.Y.2d 483, 487, 297 N.Y.S.2d 568, 571, 245 N.E.2d 219 (1969)); *see also Peel v. Crew*, No. 96 CIV. 7154(RWS), 1996 WL 719378, at *11 (S.D.N.Y. Dec.13, 1996).

In view of these competing interests, the process afforded to community board members under current law is more than adequate. Before suspension or removal of a community board member, N.Y. Educ. Law § 2590–*l*.1(b) mandates "conciliation"; and immediately after suspension or removal, a community board member is entitled to appeal to the city board. *See id.* § 2590–*l*.2.[5] Further, if the removed or suspended community board member is dissatisfied with the actions of the city board, he may seek judicial review of the city board's determination in a state court proceeding. *See, e.g., In the Matter of Community Sch. Bd. Nine v. Crew*, 224 A.D.2d 8, 648 N.Y.S.2d 81 (1st Dep't 1996); *cf. McLaughlin v. D'Elia*, 115 A.D.2d 595, 596, 496 N.Y.S.2d 257, 258 (2d Dep't 1985) (discussing an alternative administrative review process for matters outside the purview of the city board). In short, community board members receive more than the process they are due.[6]

---

5. Conciliation is not required where the community board member's conduct (i) is criminal in nature; (ii) poses an immediate danger to the safety or welfare of students or any school staff or employee; or (iii) in the judgment of the Chancellor, is "contrary to the best interest of the city school district." N.Y. Educ. Law § 2590–*l*.1(b)(i)–(iii).

6. In their complaint, the *Warden* plaintiffs assert that the absence of full evidentiary hearings violates the Fifteenth Amendment also. (*See Warden* Compl. ¶ 76) Assuming *arguendo* that the suspension or removal of an elected official is

sufficiently connected to voting to implicate the Fifteenth Amendment, plaintiffs' claim is without merit because N.Y. Educ. Law § 2590–*l* operates *without regard to race.* To the extent that plaintiffs' claim is based on the statute as applied, it is without merit for the same reasons that their as-applied equal protection claim is without merit. *See, e.g., Baker v. Pataki*, 85 F.3d 919, 926–27 (2d Cir.1996) (en banc) (Mahoney, J., concurring) ("It is settled ... that the Fourteenth *and Fifteenth* Amendments may be violated only by intentional discrimination." (citing cases) (emphasis added)).

**D. *First Amendment Claim***

Plaintiffs next allege that N.Y. Educ. Law § 2590–*l* violates the First Amendment, on the ground that it prohibits community board members from making recommendations with respect to the hiring of supervisory personnel. (*See Warden* Compl. ¶¶ 78, 93–95) The relevant provision of the statute, subsection 2–a, reads: "A member of a community school district board may be removed upon a finding that the member willfully, intentionally or knowingly interfered with or was involved in the hiring, appointment or assignment of employees other than as specifically authorized in this article." N.Y. Educ. Law § 2590–*l*.2–a. Plaintiffs contend that this prospective restriction is unconstitutionally overbroad and vague and impermissibly regulates speech on the basis of its content. (*See Warden* Pl. Mem. in Opp'n to Mun. Def. at 32–33) I disagree.

To begin, it is important to note that, on its face, N.Y. Educ. Law § 2590–*l*.2–a does not specifically prohibit recommendations with respect to the hiring of personnel. To the contrary, the statute prohibits "interfer[ing] with" or being "involved in" the hiring, appointment or assignment of certain personnel. The First Amendment does not confer rights on community board members to participate in the hiring of school personnel; such rights, if they can be called that, are the creatures of statute and, in general, do not implicate the First Amendment's protection of speech.

Nevertheless, N.Y. Educ. Law § 2590–*l*.2–a could be construed in such a way as to burden the speech of community board members—for instance, by hindering them from publicly criticizing the hiring of a particular teacher or school administrator. Thus, First Amendment analysis is warranted. *See, e.g., Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment.") (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). To the extent that such analysis is called for, the crucial issue is whether the regulation is content-based or content neu-

tral. A content-based regulation is subject to strict scrutiny, whereas a content-neutral law must pass a "less rigorous examination." *Eclipse Enter., Inc. v. Gulotta,* 134 F.3d 63, 66 (2d Cir.1997).

In the present cases, the statute at issue is content-neutral. N.Y. Educ. Law § 2590–*l*.2–a prohibits interference with the hiring process of certain school personnel irrespective of whether a community board member is seeking to support a candidate or oppose him, and without reference to the reasons for the community board member's position. The statute is "neutral—indeed it is silent—concerning any speaker's point of view." *Taxpayers for Vincent,* 466 U.S. at 804, 104 S.Ct. 2118; *see also Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("[L]aws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral."). Accordingly, the statute need not pass strict scrutiny.

Under the test set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a content-neutral speech-restricting statute is justified

if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. 1673; *see Able v. United States,* 88 F.3d 1280, 1295–96 (2d Cir.1996). Here, there is no dispute that the restriction on community board members' participation in hiring is within the constitutional power of the government. Nor is there any real dispute that the regulation furthers an important or substantial governmental interest, namely, the prevention of community board corruption. Further, my prior finding that the regulation at issue is content-neutral itself satisfies the third *O'Brien* element. *See*

*Able,* 88 F.3d at 1295. The sole question, therefore, is whether the incidental restriction on speech is greater than is essential to the furtherance of the government's interest. The fact that N.Y. Educ. Law § 2590–*l.*2–a applies only to community board members and not to the public at large, combined with the fact that the statute appears to regulate speech only incidentally if at all, leads me to conclude that it is not. *Cf. Connick,* 461 U.S. at 140, 103 S.Ct. 1684 (recognizing the state's interests in regulating the speech of its employees and stating that "[t]he problem" is "arriving 'at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees' " (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731)) Accordingly, plaintiffs' claim must be rejected.

 Plaintiffs' contention that N.Y. Educ. Law § 2590–*l.*2–a is unconstitutionally overbroad and vague is without merit for substantially the same reasons. For a statute to be unconstitutionally overbroad, its overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Similarly, a vagueness challenge should prevail "only if the enactment is impermissibly vague in all of its applications." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Given my conclusion that N.Y. Educ. Law § 2590–*l.*2–a survives application of the *O'Brien* test, it is plainly not overbroad or vague under these definitions.

### E. Remaining Claims

 Plaintiffs' remaining claims are all without merit, and warrant only brief discussion. First, plaintiffs allege that N.Y. Educ. Law § 2590–*l* denies community boards and suspended community board members the right to select counsel of their choice in violation of the Sixth Amendment. (*See Warden* Compl. ¶ 103; *Chan* Compl. ¶ 39)

Specifically, plaintiffs allege that the statute requires suspended community board members to be represented by the New York City Corporation Counsel, despite the fact that Corporation Counsel represents the Chancellor and the city board. (*See Warden* Pl. Mem. in Opp'n to Mun. Def. at 38–39) The Sixth Amendment right to counsel, however, applies only to "criminal prosecutions," and so it is not implicated here. U.S. Const. amend. VI; *see United States v. Coven,* 662 F.2d 162, 167 (2d Cir.1981). Further, to the extent that plaintiffs' claim could be redrafted under any another constitutional provision—the Due Process Clause, for example—it warrants dismissal for another reason: N.Y. Educ. Law § 2590–*l* does not appear to restrict community board members' choice of counsel at all.

 Second, variously describing it as a "literacy test" and a "poll tax," plaintiffs contend that N.Y. Educ. Law § 2590–e.7(1), which requires community board members to "participate in training to acquaint them with the powers, functions and duties" of the job, violates the Constitution and the Voting Rights Act. (*Warden* Compl. ¶¶ 97–99, 101; *Warden* Pl. Mem. in Opp'n to Mun. Def. at 35–36) The training requirement, however, is neither a literacy test nor a poll tax, but rather a reasonable regulation designed to ensure that community board members are equipped to do their jobs. To allege that the requirement creates "a substantial . . . disincentive" for minorities and the poor to seek community school board positions, as plaintiffs do (*id.*), is not only sheer speculation, but also insulting to members of those groups eager to serve on community boards, and to do so conscientiously and competently. This claim is without merit.

Finally, plaintiffs raise a claim of civil conspiracy against defendants Chancellor Crew and Edward Stancik, the Special Commissioner of Investigation for the New York City School District, appearing to allege that the Chancellor suspended members of community boards 7 and 9 in reliance on false reports produced by Stancik. (*See Warden*

Compl. ¶¶ 88–90) Plaintiffs' conclusory allegations in support of this claim, however, are insufficient to survive a Rule 12(b)(6) motion to dismiss, let alone a summary judgment motion. Moreover, to the extent that plaintiffs' conspiracy claim is premised on proof of their other, substantive claims, it would necessarily fail by virtue of the fact that those claims are all without merit.[7]

\* \* \* \* \* \*

For the foregoing reasons, the State Defendants' motions to dismiss are granted, as are the Municipal Defendants' motions for summary judgment, and the complaints in both 97 Civ. 7027 and 98 Civ. 2879 are dismissed.

SO ORDERED:

---

**7.** Plaintiff Chan lists many additional grievances in her *pro se* complaint, including several relating to the process by which the Chancellor filled two vacancies on community board 24. (*See, e.g., Chan* Compl. ¶¶ 14–31; *see also id.* ¶¶ 36, 38) None of these grievances states a claim under federal law, however. Whatever their merit un-der state law, in light of my dismissal of plaintiffs' federal claims, I decline to maintain jurisdiction over Chan's additional claims. *See* 28 U.S.C. § 1367(c)(3); *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994); *Castellano v. Board of Trustees,* 937 F.2d 752, 758 (2d Cir.1991).